***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Glenn and the briefs and arguments of the parties. The appealing parties have not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. Having reviewed the competent evidence of record, the Full Commission adopts the Opinion and Award of Deputy Commissioner Glenn with modifications. *Page 2 
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties before the Deputy Commissioner as:
 STIPULATIONS
1. All the parties are properly before the North Carolina Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter of this case. All parties are bound by and subject to the North Carolina Workers' Compensation Act. All parties have been correctly designated and there is no question as to the misjoinder or nonjoinder of any party.
2. I.C. file no. R20509 (formerly I.C. File No. 420509) (hereinafter, the "1994 claim") involves an admittedly compensable injury or occupational disease to Plaintiff's left shoulder on February 10, 1994. Defendants accepted this claim as compensable under a Form 21 Agreement, which the Industrial Commission approved on May 18, 1994. Plaintiff returned to work on approximately August 26, 1994, with Defendant-Employer or its predecessor. Defendant-Carrier CNA is the carrier at risk with respect to this claim.
3. In the 1994 claim, according to an Industrial Commission Form dated February 19, 1995, Plaintiff received a compensation check representing a 5% permanent partial disability to his left arm forwarded to him on August 26, 1994, at an assumed average weekly wage of $340.00 and an assumed compensation rate of $226.67. However, it is unclear whether the Industrial Commission ever approved a Form 26 Agreement with respect to this rating.
4. The Form 22 filed on June 29, 1994, represents an average weekly wage of $551.56 and a compensation rate of $367.73. *Page 3 
5. I.C. File No. 763617 (hereinafter, the "2005 claim") involves an alleged injury or occupational disease to Plaintiff's left shoulder that occurred on or about April 29, 2005. However, the evidence may show a different date on which Plaintiff was first (1) disabled or (2) diagnosed by competent medical authority as having a work-related medical condition. Defendants filed a Form 61 with respect to this claim on May 10, 2007. Defendant-Carrier ICSPA is the carrier at risk with respect to this claim.
6. I.C. File No. 764488 (hereinafter, the "2007 claim") involves an alleged injury or occupational disease to Plaintiff's left shoulder that occurred on or about January 1, 2007. However, the evidence may show a different date on which Plaintiff was first (1) disabled or (2) diagnosed by competent medical authority as having a work-related medical condition. Defendants filed a Form 61 with respect to this claim on September 18, 2007. Defendant-Carrier ICSPA is the carrier at risk with respect to this claim.
7. Plaintiff's average weekly wage with respect to the 2005 claim is $899.39, with a corresponding compensation rate of $599.59.
8. Plaintiff's average weekly wage with respect to the 2007 claim is $953.39, with a corresponding compensation rate of $635.59.
9. Plaintiff has worked with Defendant-Employer since August 7, 1992, as a patient services technician. Defendant-Employer has prepared a written job description of this position.
10. Plaintiff received a gross amount of $9,508.46 in total from an employer-funded short-term disability plan between March 20, 2007, and September 17, 2007.
11. Plaintiff has received a gross amount of $1,716.00 per month from an employer-funded long-term disability plan from September 18, 2007, through the present time and continuing. *Page 4 
12. Plaintiff has significant psychological diagnoses that preexisted his injuries and/or occupational diseases in these workers' compensation claims. Over the years, these diagnoses have led to substance abuse issues, which are now well-controlled and have been stable since the dates of alleged injuries in the 2005 and 2007 claims. In this matter, Plaintiff is not making and waives any claim to associate these psychological diagnoses or substances abuse issues to his alleged work-related medical conditions through the present time.
13. The following exhibits were admitted into evidence at the hearing before the Deputy Commissioner:
 a. Stipulated Exhibit #1: IC forms, medical records, discovery and etc., pages 1 through 454
 b. Stipulated Exhibit #2: job analysis
 c. Stipulated Exhibit #3: pictures
14. The following depositions were received into evidence before the Deputy Commissioner:
 a. Dr. Jerry Barron
 b. Dr. Neal Taub
 c. Dr. Roy Majors
 d. Deborah L. Caskey
15. The issues to be determined in this matter are as follows:
 a. Whether Plaintiff has been paid the correct amount of compensation for the 5% PPD rating he was given in 1994 and paid by Defendants but never approved by the North Carolina Industrial Commission, and if not, to what additional compensation he is entitled to receive. *Page 5 
 b. Whether Plaintiff has developed an occupational disease or aggravated a pre-existing condition as a result of his employment with Defendant-Employer.
 c. If so, what, if any, benefits Plaintiff is entitled to receive under the North Carolina Workers' Compensation Act.
 d. Whether Defendants are entitled to any credits if it is determined that plaintiff is entitled to workers' compensation benefits.
 e. If it is determined that Plaintiff is entitled to workers' compensation benefits, which carrier is responsible for the payment of the benefits.
 ***********
Based upon all of the competent credible evidence in the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, Plaintiff was fifty-six years old and had completed one year of community college. Plaintiff has worked as a patient services technician for defendant-employer or its predecessor companies for approximately sixteen years. His job activities have not changed significantly during these sixteen years.
2. Defendant-Employer's business involves delivery of home healthcare products and oxygen, which comes either in aluminum cylinders that hold compressed gas oxygen or in synthetic cylinders (also called "liberators") that carry liquid oxygen. Plaintiff drove a truck as a part of his job. Most of the time, Plaintiff used non-motorized hand trucks to transport the cylinders and liberators to and from the patient's house. Plaintiff had to lift liberators and *Page 6 
cylinders, as well as other medical supplies of various weights and sizes, on and off his truck and in patients' houses during these deliveries.
3. Plaintiff averaged between fifteen and eighteen deliveries per workday. His workday was usually between eight and ten hours, but sometimes up to fourteen hours.
4. In his job, Plaintiff normally drove a truck that had an "accordion type door" on the back. Plaintiff had to open and close this door between twenty and forty times every workday by using his arms to reach overhead and pulling on the strap handle.
5. As a part of his job, Plaintiff had to fill liberators with liquid oxygen at the patients' homes or other locations. In order to fill the liberators, Plaintiff had to lift each liberator at least twice, once onto and another time off of a hand truck, then onto a scale to weigh them, then return it to the patient's home to its original location, and often times he had to lift the liberators from the back of his delivery truck itself. Plaintiff used his arms at angles of 90 degrees or more to perform these activities. He lifted liberators in this fashion between 15 and 20 times per day.
6. While empty, liberators weighed 25 to 50 pounds. When filled with liquid oxygen, however, liberators weighed up to 150 to 165 pounds.
7. Plaintiff would also have to reach over head to obtain some of the supplies that he was delivering to defendant-employer's patients, and these items could weigh as much as ten or more pounds each. Plaintiff also had to deliver and lift durable medical equipment, such as beds and set them up in the patients' homes.
8. For years, Plaintiff also had to load his own truck with the supplies, cylinders, and liberators that he delivered. Loading his truck required him to lift these items overhead and at angles exceeding 90 degrees in order to place them on the overhead shelf in the back of his truck *Page 7 
or, in case of the cylinders and liberators, to lifting them at lower levels in the truck by their handles, which were waist-high.
9. On February 10, 1994, Plaintiff injured his left shoulder while moving cylinders. Defendants admitted liability for this compensable injury in a Form 21 Agreement, which the Commission approved on May 18, 1994.
10. Dr. David Humphries, MD, treated Plaintiff for his 1994 injury to his left shoulder. Dr. Humphries performed a rotator cuff repair and Plaintiff recovered well from this surgery, returning to his job as a patient services technician with Defendant-Employer on August 26, 1994.
11. Defendants paid total disability and permanent partial disability based on a 5% rating assigned by Dr. Humphries to Plaintiff's left upper extremity for the 1994 claim. However, they did so based on an incorrect compensation rate of $226.67.
12. Plaintiff's pre-injury average weekly wage for the 1994 claim was $551.56. Two-thirds of this amount is $367.73. Defendant-Employer and Defendant-Carrier CNA still owe Plaintiff by a total of $3,989.98 for the 1994 claim in both temporary total and permanent partial disability compensation.
13. Defendant-Employer and Defendant-Carrier CNA submitted several drafts of a Form 26 Agreement to the Commission, which never approved any agreement representing the 5% PPD rating in the 1994 claim.
14. Plaintiff continued to work in his job as a patient services technician with Defendant-Employer between August 26, 1994, and May 10, 2005. He took pain medications to alleviate his ongoing left shoulder pain and became addicted to them. By May 2005, however, his substance abuse issues were stable and controlled, and Plaintiff was enrolled in a methadone *Page 8 
treatment program. In the present litigation, Plaintiff has waived any claim to pay for this program or medical compensation related to his substance abuse treatment through May 10, 2005.
15. On May 4, 2005, Plaintiff saw Dr. Roy Majors with complaints of shoulder pain "for the past several months" that had progressively worsened, with no one injury. Dr. Majors diagnosed him as having inflammation of his AC joint, impingement of his rotator cuff with a large bony spur resulting in both bursitis and tendonitis, and a possible recurrent rotator cuff tear. On May 10, 2005, Dr. Major performed an arthroscopic surgical revision of Plaintiff's shoulder, including a bursectomy, a debridement of the rotator cuff, a subacromial decompression, and an acromioclavicular resection. Among other purposes, these procedures aimed to widen the subacromial space in Plaintiff's left shoulder in order to alleviate Plaintiff's bursitis. Following the surgery, Plaintiff's shoulder pain improved.
16. Plaintiff was medically incapable of performing any work as the result of his shoulder condition between May 10, 2005, and July 8, 2005. At that time, he returned to his job as a patient services technician with Defendant-Employer.
17. Plaintiff's average weekly wage before May 10, 2005, was $899.39, which would yield a compensation rate of $599.59 per week.
18. Plaintiff's left shoulder continued to hurt after he returned to work in July 2005. Plaintiff's job activities at Defendant-Employer were consistent and did not change significantly throughout his 16-year career.
19. Plaintiff returned to Dr. Majors on February 5, 2007, because his shoulder condition had gotten worse. Plaintiff again reported to Dr. Majors "progressive" shoulder pain over the previous several months that arose without a specific incident, although Plaintiff did *Page 9 
indicate that his lifting activities at work seemed to aggravate his shoulder pain. On physical examination, Plaintiff again exhibited abnormal findings that were consistent with bursitis and tendonitis of his left shoulder.
20. An MRI taken on February 27, 2007, showed that Plaintiff had developed a small full-thickness rotator cuff tear.
21. On March 13, 2007, Dr. Majors performed a re-do bursectomy, as well as a subacromial decompression and an acromioclavicular resection. Dr. Majors' surgical findings included a "thickened inflamed bursa" and "impingement" of the bursal tissue in Plaintiff's shoulder.
22. Plaintiff's average weekly wage before March 13, 2007, was $953.39, yielding a compensation rate of $635.59 per week.
23. Plaintiff was incapable of any work between March 13, 2007, and August 15, 2007. On August 15, 2007, Dr. Majors released Plaintiff to modified light duty work with work restrictions of lifting limited to 20 pounds with his left arm, pending a functional capacity examination. Dr. Majors also recommended work conditioning. However, no functional capacity examination of Plaintiff was completed, and Plaintiff was unable to obtain work conditioning because his injury was not being treated as an injury under the Workers' Compensation Act.
24. Dr. Majors last treated Plaintiff on October 24, 2007, at which time he told Plaintiff that Plaintiff probably had more rotator cuff tears, and that Dr. Majors could only recommend additional physical therapy at that point, as Plaintiff was too young for a shoulder replacement. Plaintiff would have to go to another doctor if he wanted to pursue that surgery or any other further care. *Page 10 
25. In his October 24, 2007, medical note, Dr. Majors indicated that he was unable to apportion the cause of Plaintiff current condition between the pre-existing effects of his 1994 shoulder surgery and Plaintiff's subsequent work for Defendant-Employer. However, Dr. Majors did note that the heavy lifting Plaintiff performed for Defendant-Employer "has a high likelihood of aggravating his shoulder."
26. In his deposition testimony, Dr. Majors reiterated that he was unable to opine whether the shoulder conditions for which he treated Plaintiff were a consequence of Plaintiff's 1994 surgery or due to Plaintiff's subsequent work for Defendant-Employer: "[I]n my opinion, I cannot greater than a 50/50 chance say that the lifting required by [Plaintiff's work] significantly affected his pre-existing condition." Nonetheless, Dr. Majors did acknowledge that the heavy lifting performed by Plaintiff did place him at an "increased risk compared to other occupations" for developing shoulder problems.
27. On January 28, 2008, Plaintiff went to Dr. Jerry Barron on the referral of Dr. Neal Taub, MD, his pain management doctor, because Dr. Majors would no longer treat him. A CT arthrogram showed a recurrent full thickness rotator cuff tear that was retracted about two centimeters. Dr. Barron recommended a partial left shoulder replacement. However, Plaintiff has not been able to have this surgery because of a lack of insurance or other funds.
28. Dr. Barron opined, and the Full Commission finds as fact, that Plaintiff's lifting activities at work significantly contributed to the development of Plaintiff's left shoulder condition, likely aggravated the existing conditions in Plaintiff's left shoulder, and placed Plaintiff at an increased risk of developing and/or aggravating his left shoulder condition. To the extent that Dr. Majors' disinclination to causally relate Plaintiff's lifting activities to Plaintiff's *Page 11 
shoulder condition may be construed as an opinion against such a causal relationship, the Full Commission gives greater weight to the opinion of Dr. Barron on this matter.
29. The Full Commission finds, based on the greater weight of the evidence, that Plaintiff's bursitis as treated by Dr. Majors in 2005 and 2007 was due to intermittent pressure in Plaintiff's employment with Defendant-Employer arising out of Plaintiff's lifting activities.
30. The Full Commission finds, based on the greater weight of the evidence, that Plaintiff's additional left shoulder conditions treated by Dr. Majors in 2005 and 2007, including his rotator cuff tears, were caused by or significantly aggravated by Plaintiff's lifting activities for Defendant-Employer. The Full Commission further finds that Plaintiff's employment with Defendant-Employer exposed Plaintiff to a greater risk of contracting those shoulder conditions than the public generally.
31. Since August 15, 2007, in light of his work restrictions, Plaintiff has pursued vocational rehabilitation both through his private insurance and through the State of North Carolina. However, Plaintiff has been informed that he needs to complete his recommended medical treatment, including the partial shoulder replacement recommended by Dr. Barron, before he would be a viable candidate for vocational rehabilitation services.
32. The Full Commission finds, based on the greater weight of the evidence, that from August 15, 2007, through the present time and continuing, it has been futile for Plaintiff to seek other employment given his age of 56 years, his long-term career in a single job at Defendant-Employer, his medical conditions, his non-viable candidacy for vocational rehabilitation services, and his fundamental need for additional surgery to his left shoulder.
33. Plaintiff has received short-and long-term disability under employer-funded plans from March 20, 2007, through the present time. Both of these plans have reimbursement or *Page 12 
subrogation provisions under which Plaintiff has to reimburse the short-term or long-term disability carriers in the event that he receives workers' compensation benefits. Plaintiff has also received long-term disability benefits under a non-employer funded plan, which has a similar reimbursement or subrogation provision as the employer-funded plans.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff had a compensable injury to his left shoulder on February 10, 1994, arising out of and in the course of his employment with Defendant-Employer. N.C. Gen. Stat. § 97-2(6). Defendants' acceptance of this claim under a Form 21 Agreement gave rise to presumptions that all future medical treatment and disability were causally related to this injury. Parsons v. ThePantry, Inc., 126 N.C. App. 540, 485 S.E.2d 867 (1997).
2. Defendant-Carrier CNA is the carrier liable for Plaintiff's 1994 claim. N.C. Gen. Stat. § 97-93.
3. Plaintiff is entitled to lifetime medical compensation from his February 10, 1994 left shoulder claim. Hyler v. GTE Prods.Co., 333 N.C. 258, 425 S.E.2d 698 (1993); Reform Act, ch. 679, § 11.1(g), 1994 N.C. Adv. Legis. Serv. 319, 343, now codifiedat N.C. Gen. Stat. § 97-25.1 (imposing a 2-year limitations period for additional medical compensation, with some exceptions, but only to claims arising after July 5, 1994).
4. Plaintiff is entitled to $3,989.98 in unpaid temporary total and accrued permanent partial disability compensation for Dr. Humphries 5% rating with respect to Plaintiff's 1994 claim. N.C. Gen. Stat. § 97-31. *Page 13 
5. Defendant-Employer and Defendant-Carrier CNA have not yet made the "last payment of compensation" for the 1994 claim, nor has there been a "final award" in that claim that has triggered the two-year limitations period under N.C. Gen. Stat. § 97-47. Therefore, Plaintiff is still entitled to indemnity compensation resulting from his shoulder injury in the 1994 claim. However, Plaintiff has not been disabled due to his 1994 injury prior to May 4, 2005.
6. Plaintiff's left shoulder conditions, including his bursitis and rotator cuff tear, were a compensable occupational disease as of May 4, 2005. Plaintiff's bursitis was due to intermittent pressure in his employment. N.C. Gen. Stat. § 97-53(17). Plaintiff's rotator cuff tear and other left shoulder conditions were causally related to Plaintiff's employment, and Plaintiff's employment exposed Plaintiff to a greater risk of contracting those conditions than the public generally. N.C. Gen. Stat. § 97-53(13); Rutledge v. TultexCorp., 308 N.C. 85, 93-94, 301 S.E.2d 359, 365 (1983).
7. In regard to the 2005 claim, Plaintiff was last injuriously exposed to the hazards of developing his left shoulder conditions while employed with Defendant-Employer immediately preceding May 10, 2005. As a consequence, Defendant-Carrier ICSPA is the carrier liable for the 2005 claim. N.C. Gen. Stat. § 97-57.
8. Plaintiff was totally disabled due to his 2005 occupational disease between May 10, 2005, and July 8, 2005. N.C. Gen. Stat. §§ 97-2(9), 97-29.
9. At the time of the 2005 claim, Plaintiff's average weekly wage was $899.39, with a corresponding compensation rate of $599.59. N.C. Gen. Stat. §§ 97-2(5), 97-29.
10. Plaintiff's left shoulder conditions, including his bursitis and rotator cuff tear, were an independent compensable occupational disease as of February 5, 2007. Plaintiff's bursitis was due to intermittent pressure in his employment. N.C. Gen. Stat. § 97-53(17). *Page 14 
Plaintiff's rotator cuff tear and other left shoulder conditions were causally related to Plaintiff's employment, and Plaintiff's employment exposed Plaintiff to a greater risk of contracting those conditions than the public generally. N.C. Gen. Stat. § 97-53(13); Rutledge v. Tultex Corp., 308 N.C. 85,93-94, 301 S.E.2d 359, 365 (1983).
11. In regard to the 2007 claim, Plaintiff was last injuriously exposed to the hazards of developing his left shoulder conditions while employed with Defendant-Employer immediately preceding March 13, 2007. As a consequence, Defendant-Carrier ICSPA is the carrier liable for the 2007 claim. N.C. Gen. Stat. § 97-57.
12. Plaintiff has been totally disabled due to his 2007 occupational disease from March 13, 2007, through the present time and continuing. N.C. Gen. Stat. §§ 97-2(9), 97-29.
13. At the time of the 2005 claim, Plaintiff's average weekly wage was $953.39, with a corresponding compensation rate of $635.59. N.C. Gen. Stat. §§ 2(5), 97-29.
14. Defendants are entitled to a credit for the short-term and long-term disability payments that Plaintiff has received. N.C. Gen. Stat. § 97-42.
15. Plaintiff has required and will in the future require reasonable and necessary medical compensation to address his left shoulder conditions arising out of his 2005 and 2007 occupational diseases. Defendant-Employer and Defendant-Carrier ICSPA shall be liable for these medical conditions as set forth in this Opinion and Award. N.C. Gen. Stat. §§ 97-25, 97-57.
16. The Full Commission concludes that N.C. Gen. Stat. § 97-86.1(b) is inapplicable to the facts of this matter, and therefore declines to order payment pursuant to that statute.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following: *Page 15 
 AWARD
1. Subject to the attorneys' fees set out below, Defendant-Employer and Defendant-Carrier CNA shall pay $3,989.98 to Plaintiff as an underpayment of temporary total and accrued permanent partial disability compensation for Dr. Humphries 5% rating with respect to Plaintiff's 1994 claim.
2. Subject to the attorneys' fees set out below, and subject to a credit for the amount Plaintiff received from an employer-funded short-term disability plan between March 20, 2007 and September 17, 2007, Defendant-Employer and Defendant-Carrier ICSPA shall pay temporary total disability compensation to Plaintiff in the amount of $599.59 per week for the period from May 10, 2005, to July 8, 2005.
3. Subject to the attorney's fees set out below, and subject to a credit for the amount Plaintiff has received from an employer-funded long-term disability plan since September 18, 2007, Defendant-Employer and Defendant-Carrier ICSPA shall pay temporary total disability compensation to Plaintiff in the amount of $635.59 per week for the period from March 13, 2007, through the present time and continuing until Plaintiff returns to work earning the same or greater wages as he was earning on March 13, 2007, or until further Order of the Commission.
4. Defendant-Employer and Defendant-Carrier CNA shall be liable and shall authorize and pay for all medical compensation necessitated by Plaintiff's 1994 claim prior to May 5, 2005.
5. Defendant-Employer and Defendant-Carrier Insurance ICSPA shall pay all medical expenses incurred or to be incurred by Plaintiff as a result of his compensable occupational diseases of 2005 and 2007 for so long as such evaluations, treatments, and examinations may reasonably be required to effect a cure, give relief, and/or lessen Plaintiff's *Page 16 
period of disability as it relates to Plaintiff's 2005 and 2007 claims, including but not limited to the recommendations and treatment by Dr. Jerry Barron.
6. Plaintiff's counsel is entitled to a reasonable attorney's fee in the amount of 25% of all compensation awarded pursuant to Paragraphs 1, 2, and 3 above. Defendants shall forward these fees directly to Plaintiff's counsel.
7. With respect to accrued amounts of compensation and fees, Defendants shall forward all accrued amounts to Plaintiff's counsel for appropriate disbursement. With respect to prospective amounts, Defendants shall send periodic compensation directly to Plaintiff minus the attorneys' fees, which shall be paid in the form of every fourth check or 25% of every check.
9. Defendants shall pay the costs of this action.
This the 15th day of February, 2009.
 S/___________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/___________________ PAMELA T. YOUNG CHAIR
S/___________________ STACI T. MEYER COMMISSIONER *Page 1